COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  | § |  |
|---|---|---|
| THE STATE OF TEXAS, | | No. 08-14-00014-CR |
|  | § | |
| Appellant, | | Appeal from |
|  | § | |
| v. | | 171st District Court |
|  | § | |
| PHILLIP ANDREW FRIAS, | | of El Paso County, Texas |
|  | § | |
| Appellee. | | (TC # 2013D03266) |
|  | § | |

## **O P I N I O N**

The State is appealing the trial court's order granting Frias's motion for new trial on the grounds he received ineffective assistance of counsel. For the reasons, that follow we sustain the State's sole point of error and reverse the judgment of the trial court.

## **FACTUAL BACKGROUND**

On January 7, 2012, Phillip Frias kidnapped and sexually assaulted seventeen-year old K.N. A jury found him guilty of two counts of aggravated sexual assault (Counts I and II) and aggravated kidnapping (Count III) as alleged in the indictment. The jury assessed punishment at life imprisonment on all three counts. Frias timely filed his motion for new trial, which the trial court granted on the ground that he received ineffective assistance of counsel. Roland Monteros represented Frias at both the guilt-innocence and punishment phases of trial.

The State gave notice of intent to introduce extraneous offenses at the punishment phase.

Arresting officers testified that when they arrested Frias, they found marijuana in his possession. In April 2007, while attending a party at the home of fourteen-year old B.H., Frias entered B.H.'s bedroom where she was playing video games with her sixteen-year old best friend. He closed the door, and told B.H. that he was going to " . . . teach you [sic] something that you [sic] mother should have taught you, not let strangers into your room," at which point he inserted his penis into her mouth for approximately 15 to 20 minutes. Frias then threatened B.H. by telling her that he would suffocate her with a pillow if she tried to make a sound or stop him.

The State then admitted into evidence several judgments reflecting that Frias had previously been convicted of unlawfully carrying a weapon on June 3, 2003; a Class A misdemeanor assault (as a lesser-included offense) when he attempted to rape L.M. on September 13, 2007; two counts of resisting arrest also on September 13, 2007; a state-jail felony offense of theft of services in the amount of $1,500 or more, but less than $20,000 on October 23, 2008; burglary of a building (a lesser-included offense of burglary of habitation) on January 31, 2000; and evading arrest or detention in a motor vehicle on October 23, 2008. Frias dated L.M. for a couple of years. L.M. testified that in January 2007, after she and Appellee were no longer dating, he forced himself into her apartment, tried to drag her to her bedroom, ripped off her underwear, began hitting her in the face as she resisted him, threatened to kill her if she did not stop resisting, and, at one point, tried to snap her neck. L.M. hit, kicked, and scratched back to the point where Frias screamed so loudly the police were called. The police kicked down the door and apprehended Frias, who attempted to flee from the scene. This incident led to his being charged with the Class A misdemeanor assault for the attempted rape and the two counts of resisting arrest discussed above.

In February of 2011, Frias became friends with L.S. Shortly thereafter, he lured her into

his bedroom under false pretenses, pushed her down on his bed, raped and choked her. He took nude photographs without her consent, which he used as blackmail so that L.S. would continue to have sexual intercourse with him for the next month until she reported him to the police with the assistance from her school counselor.

Joseph Palmer testified that in July 2011, Frias assaulted him at the latter's stepfather's home. Palmer explained that Frias had beaten him so severely that he was hospitalized for three days, underwent surgery to repair a fractured nose and jaw, and sustained an injury to his kidney, and lost several of his teeth. In December 2011, Frias raped R.L. after she became unconscious from consuming alcohol and cocaine with him.

Frias timely filed his motion for new trial in which he alleged several grounds of ineffective assistance of counsel. Specifically, he argued that counsel (1) failed entirely to consult with him prior to trial about the facts of the case and any possible defenses; (2) failed to investigate the facts upon which the prosecution was based; and (3) failed to investigate his character and background. The trial court held a series of three hearings on the motion and ultimately granted it. The court heard testimony from Frias and his mother, Sara Favela; Monteros; Assistant District Attorney, Holly Rodriguez; and Frias's former probation officer, Maggie Morales. The trial court found Monteros's testimony to be so conflicting, inconsistent, and uncertain, that it could not be relied upon as an accurate or sufficient explanation of his actual performance or strategy, if any. The court found the testimony of Frias, Favela, and Morales to be credible and reliable.

When questioned about his consultations with Frias, Monteros could not specifically recall the exact number of times or locations he visited with his client, but he did remember speaking to him at either the El Paso County Jail or in the courtroom. He explained that his

visits were usually in conjunction with a regularly scheduled court setting. During these courtroom visits, Monteros would sometimes meet with Frias while he was in the jury box with other inmates or in the holding cell behind the courtroom, always discretely.

Monteros reviewed the State's case file along with Frias's statement to the police. When asked what kind of investigation he conducted into the extraneous offenses, he explained that he only reviewed the State's file and police reports and opted not to conduct his own investigation because he was more concerned about the guilt-innocence phase of the trial.

Monteros did not file any pretrial motions. Specifically, he did not move to suppress his client's statement on the grounds that police questioned him about unrelated offenses while he was already represented by counsel. He did not file a motion for discovery because he believed that the State had already complied with its discovery requirements. He did not move to appoint an investigator or obtain a DNA expert. He did not interview any of the State's witnesses prior to trial or move to suppress the pretrial lineup or K.N.'s in-court identification. Monteros knew that Frias had a long history of mental illness. Both Frias and his mother informed him that Frias was bipolar and suffered from depression. Monteros did not request a psychiatric evaluation prior to trial or obtain any medical records. He had experience with mental-competency hearings, was aware of his clients's mental health issues, but nonetheless determined that there was nothing that indicated Frias was incompetent to stand trial. Specifically, he felt that Frias was able to communicate with him, understood the nature of the charges against him, was able to interact with the trial court, and offered suggestions on possible avenues for his defense. On cross-examination, Monteros explained that while he interviewed his client's mother and grandmother, he determined that their knowledge would not be helpful. Frias had several factors stacked against him -- he was a convicted felon with numerous unadjudicated sexual assault

4

offenses, who injured K.N. while he sexually assaulted her, and DNA evidence identified him as the perpetrator. He did not move to suppress Frias's statement to the police because there were no meritorious grounds to raise; he did not seek discovery because he thought the State was not withholding evidence; he did not ask for an investigator because he thought it was a straightforward case; and he did not request a DNA expert because there were no apparent irregularities. Finally, when questioned about his overall trial strategy, Monteros testified that he tried to create a reasonable doubt at the guilt-innocence phase by insinuating that K.N. got "around a little bit," and to humanize Frias during the punishment phase. Frias testified that although he spoke to Monteros right after he was arrested, they never discussed the offense. He estimated that he met with counsel approximately five times, but it was usually in the courtroom jury box with other inmates, and with several assistant district attorneys nearby. He kept asking when there would be an opportunity to speak about his case, to which counsel replied that he would come see him in the county jail. He never did so.

On cross-examination, Frias discussed how Monteros only shook his hand and asked if he was reading the Bible whenever he saw him in the courtroom. He admitted having a conversation about pursuing a discrepancy in K.N.'s description of his car, the State's DNA evidence, and calling his step-father as a potential witness. Monteros initially did not want to call the step-father as a witness, which caused Frias to "jump out and blurt out where is [sic] my witnesses" at trial.

Frias testified that he understood the trial court's questions regarding the State's plea recommendation, the judge's role in his case, his defense attorney's role in his case, and the State's role in presenting evidence against him. He then changed his mind regarding counsel's role in his case, testifying that he did not actually understand and that if his lawyer had "done

5

any job" he would not have received a life sentence. While Frias had been through the criminal justice process on several previous occasions, he claimed that he did not know what was going on during his trial. When the trial court asked him what he would have told Monteros had he visited with him, Frias responded, "[e]verything."

Frias was enrolled in special education classes throughout elementary, middle, and high school. He was seventeen years old when he was first referred for a psychiatric evaluation to determine whether he had a mental disorder. He was diagnosed with bipolar disorder, manic depression, and schizophrenia. He was prescribed Zoloft and met with a doctor once a week or once every two weeks for approximately three years. After serving his first prison sentence, he enrolled to receive services at MHMR, was prescribed Paxil, and received additional treatment for a few years. Shortly thereafter, he stopped taking his medication and began using marijuana. When he was 25 years old, he was arrested again for aggravated robbery, which was pled down to theft, and while he was serving time for this offense, he was prescribed Depakote, Lithium, and Trazodone for his bipolar disorder and manic depression. Once he was released, he returned to MHMR and was prescribed Seroquel, Depakote, and Trazodone. When Frias was 30 or 31 years old, he was re-diagnosed with schizophrenia. He stopped taking his medications about two years before he committed the charged offense because his mother could no longer afford to pay for them. Frias testified that when he disclosed his history of mental illness to Monteros, counsel dismissed him and never allowed him the opportunity to elaborate further. Favela testified that Monteros never scheduled an appointment with her to discuss the facts of her son's case. However, on cross-examination she acknowledged that in the jail telephone call recordings, she told Frias that she had spoken to Monteros. She similarly discussed how her son had been diagnosed with bipolar disorder and depression, and was enrolled in special education classes in

6

school.

Maggie Morales was Frias's former probation officer. She became a licensed professional counselor in 2006 and was qualified to make a diagnosis of mental illness at the time of the motion for new trial. She was not involved in his 2013 trial but she did supervise him for approximately one year during the early 2000's while he was on probation for burglary of a habitation. He was assigned to the mental-health unit where she worked because of his bipolar disorder. Morales explained that Frias had mixed bipolar disorder in that he suffered manic episodes, which could include disrupted sleep, insomnia, distorted thinking patters, accelerated speech, irritability, and anger. He also suffered from depression, which included suicidal ideations, insomnia, and an inability to eat. Nothing in her records, however, indicated that he was schizophrenic. She did explain that his records reflected that he had auditory hallucinations, which might have been a condition called schizoaffective disorder. When Frias worked with Morales, he was very symptomatic and had a hard time adjusting to his medications and complying with his treatment regimen. Morales testified that Frias had a hostile home environment which affected his ability to consistently stay on his medications. When asked how his mental disorders might have affected his competency, Morales opined that it might have affected him if he were unable to assist in his defense, but she could not say whether or not he was competent to stand trial.

At the hearing on the motion for new trial, the trial court took judicial notice of an instance in which Frias stated the following about his attorney:

But do you hear what I am saying, I can't do nothing?

A few minutes later, he went on to say:

You know what, you're not helping me at all bud.

After discussing his comments with the trial court, Frias explained:

> But I have nobody to defend me, not even my attorney is defending me. I have nobody to defend me. I have to stand up for myself. I can't even do that.

The trial court also summed up the timeline of the trial. The guilt-innocence phase began at 8:46 a.m. and concluded at 11:28 a.m. on the same day. Monteros only engaged in ten minutes of cross-examination during the guilt-innocence and eleven minutes during the punishment phase. The defense case in chief lasted approximately sixteen minutes.

At the conclusion of the hearings, Frias agreed that any untimely amendments to his motion should not be considered by the trial court because the State properly objected. However, he argued that any new allegations of ineffective assistance were not untimely because they did not raise a wholly distinct legal ground but instead were an extension of the overall ineffective assistance complaint urged in his original motion. He also alleged that his claims were governed by the *Cronic* standard. The State and the trial court were in agreement that an allegation of ineffective assistance did not allow Frias to "bootstrap" other ineffective assistance claims not previously pled. The State disagreed that the *Cronic* standard applied and instead argued that the claims were governed by the *Strickland* standard. In doing so, the State insisted that Frias failed to satisfy either prong of *Strickland* because he failed to show both deficient performance and prejudice. Specifically, the State insisted that even if Frias demonstrated that counsel conducted a minimal investigation, he still failed to prove prejudice because he failed to produce evidence of what counsel might have found had he investigated; how such evidence would have benefitted him; and that there was a reasonable probability that the outcome would have been different had counsel produced the evidence, given the overwhelming strength of the State's case. In its findings of fact and conclusions of law, the trial court determined, under the *Cronic* standard, that Monteros failed to: (1) interview Frias and the State's lay and expert

8

witnesses; (2) interview Frias and other witnesses regarding his extraneous offenses; (3) request the funds to hire a private investigator, a DNA expert, forensic psychiatrist, or any other mental health expert to determine whether Frias suffered from any mental condition that might have been relevant to his defense, including competency, insanity, or disability relevant to the mitigation of punishment; (4) file any motions with the court, such as a motion to suppress Frias's recorded interview with law enforcement, a motion to suppress in-court testimony based on a pretrial lineup in which Frias was identified by K.N., or a motion to exclude the testimony of the DNA expert for the State which connected Frias to the alleged offense; (5) effectively cross examine the State's witnesses; (6) call any witnesses to testify on behalf of Frias; and (7) identify any specific defense strategy he had both the guilt and punishment phase of the trial. With these findings, the court concluded that counsel did not subject the State's prosecution to any meaningful adversarial testing at either phase of his trial.

The trial court set out additional findings under the *Strickland* standard, specifically, that Frias suffered from multiple severe mental illnesses, including bipolar disorder and schizophrenia, which were relevant to the issues of his competency to stand trial, his mental state at the time he was alleged to have committed the charged offenses and the appropriate punishment to be assessed in the event of a conviction. Monteros never moved for a psychiatric evaluation of Frias to determine his competency to stand trial, insanity at the time of offenses, or disability relevant to the mitigation of punishment. The trial court determined that Frias's history of mental illness alone was sufficient to raise the issue of his competence to stand trial such that, had his history been made known to the court before trial, the trial court would have referred him for a competency evaluation in accordance with the requirements of the law. Additionally, the trial court found that Frias's testimony and demeanor in open court were

9

suggestive of deficits in his thought processes that might have rendered him incompetent to stand trial. Finally, the trial court determined that counsel did not provide any reasonable strategic or tactical explanation during his testimony for his failures and that this performance fell below the objective standard of reasonableness for the effective representation of persons charged with serious felony offenses in El Paso County, Texas. But for counsel's failure to provide reasonable professional services as defense counsel, the trial court reasoned that there was a reasonable probability that the result of the trial would have been different.

## MULTIFARIOUS ISSUE

While the State presents a sole issue for our review, it is clear that four separate arguments are actually raised: (1) whether the trial court granted a new trial on the same legal claim as was raised in the motion for new trial; (2) whether defense counsel subjected the prosecution's case to meaningful adversarial testing under *Cronic*; (3) whether the performance of counsel fell below an objective standard of reasonableness under the first prong of *Strickland*; and (4) whether Frias was prejudiced by his counsel's alleged deficient performance under the second prong of *Strickland*. Frias counters that because the State's issue is multifarious, it presents nothing for our review.

A multifarious issue embraces more than one specific ground. *Mays v. State*, 318 S.W.3d 368, 385 (Tex.Crim.App. 2010); *Smith v. State*, 316 S.W.3d 688, 694 (Tex.App.--Fort Worth 2010, pet. ref'd)(citations omitted). By combining more than one contention in a single issue, an appellant risks rejection on the ground that nothing is presented for review. *See Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex.Crim.App. 2000)(refusing to address multifarious grounds).

We may, however, address contentions presented in a multifarious issue if they are sufficiently developed in the brief and preserved for our review. *Id.*; *Thornton v. D.F.W.*

10

*Christian Television, Inc.*, 925 S.W.2d 17, 22-23 (Tex.App.--Dallas 1995), *rev'd on other grounds*, 933 S.W.2d 488 (Tex. 1996)(explaining that an appellate court has the discretion to consider a multifarious issue provided it can determine, with reasonable certainty, the alleged error about which the complaint is made); TEX.R.APP.P. 33.1.

## UNTIMELY AMENDEMENT

The State first argues that the trial court abused its discretion when it granted a new trial based on new ineffective assistance claims that were not raised in the original motion. In response, Frias insists that the grounds alleged were not untimely because they did not raise a wholly distinct legal ground, but instead were an extension of his overall ineffective assistance complaint made in his original motion.

## Standard of Review

We review a trial judge's decision to grant a motion for new trial for an abuse of discretion. *State v. Herndon*, 215 S.W.3d 901, 907 (Tex.Crim.App. 2007). That discretion, however, is not unbounded or unfettered. *State v. Zalman*, 400 S.W.3d 590, 593 (Tex.Crim.App. 2013). A judge is permitted to grant or deny a motion for new trial "in the interest of justice," but justice means in accordance with the law. *Herndon*, 215 S.W.3d at 907. A judge may not grant a new trial on mere sympathy, an inarticulate hunch, or simply because he believes the defendant received a raw deal or is innocent. *Id.* As the Court of Criminal Appeals explained in *Herndon*, there is generally no abuse of discretion if the defendant: (1) articulated a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the harmless error standards of the Texas Rules of Appellate Procedure. *Id.* at 909. The court has repeatedly held that

11

> An essential element of [a motion for new trial] is that the matter or error relied upon for a new trial must be specifically set forth therein. The wisdom of that rule lies in the fact that reasonable notice should be given not only to the trial court but the State, as well, as to the misconduct relied upon and to prevent a purely fishing expedition on the part of the accused. [Citations omitted].

*Harvey v. State*, 201 S.W.2d 42, 45 (Tex.Crim.App. 1947). The purpose of this requirement is to allow the court sufficient notice to prepare for the hearing and make informed rulings as well as allow the State to have enough information in order to prepare a rebuttal. *See also Trout v. State*, 702 S.W.2d 618, 620 (Tex.Crim.App. 1985)(holding that the ground must be mentioned in the motion; it is not sufficient to merely supply supporting affidavits).

### Analysis

Rule 21 of the Texas Rules of Appellate Procedure governs motions for new trial. *Zalman*, 400 S.W.3d at 593. The defendant's motion must be filed "no later than 30 days after, the date when the trial court imposes or suspends sentence in open court." TEX.R.APP.P. 21.4(a).

A motion is a prerequisite for the trial court to grant a new trial; the court may not do so on its own motion. *State v. Aguilera*, 165 S.W.3d 695, 699 (Tex.Crim.App. 2005). The accused is required to allege sufficient grounds to apprise the trial court and the State as to why he believes he is entitled to a new trial. *Zalman*, 400 S.W.3d at 594 (explaining that the motion must contain enough detail to give the other party notice of what is being complained of so that it can properly prepare for the hearing); *State v. Gonzalez*, 855 S.W.2d 692, 694-95 (Tex.Crim.App. 1993).

A defendant may amend his motion without leave any time within the thirty-day limit so long as the trial court has not already ruled. TEX.R.APP.P. 21.4(b). The Court of Criminal Appeals has interpreted this statute as barring amendments outside of the thirty-day time limit, even with leave of the court, so long as the State properly objects. *State v. Moore*, 225 S.W.3d

556, 570 (Tex.Crim.App. 2007). A trial court may not order a new trial on a ground for relief not alleged in the motion for new trial, even if it is supported by the evidence. *State v. Provost*, 205 S.W.3d 561, 565-66 (Tex.App.--Houston [14th Dist.] 2006, no pet.)(allegation of insufficient evidence will not support new trial on ground of ineffective counsel). Evidence presented to the trial court in support of an untimely amendment should not be considered part of the record on appeal. *Licon v. State*, 99 S.W.3d 918, 926 (Tex.App.--El Paso 2003, no pet.). Should the trial court refuse to limit its ruling to the original motion and grant relief on the basis of the amendment over the State's objection, the appellate court should consider only the validity of the original and any timely amended motion for new trial, and should reverse any ruling granting a new trial based upon matters raised for the first time in an untimely amendment. *Moore*, 225 S.W.3d at 570.

In *Cueva v. State*, 339 S.W.3d 839 (Tex.App.--Corpus Christi 2011, pet. ref'd), the defendant filed a motion for new trial claiming ineffective assistance of counsel in his criminal trial. He specified three deficiencies but there were "significant differences" between those claims and the ones he later argued at the new-trial hearing. *Id.* at 858. The State properly objected to these late-added arguments. *Shamim v. State*, 443 S.W.3d 316, 326 (Tex.App.--Houston [1st Dis.] 2014, pet. ref'd). The appellate court relied on Rule 21 and held that the trial court was not permitted to consider the untimely arguments or evidence presented at the new-trial hearing in support of those arguments. *Cueva*, 339 S.W.3d at 858-59. A concurring opinion issued when the Court of Criminal Appeals denied rehearing on the petition for discretionary review expressly approved of the appellate court's analysis:

> The court of appeals correctly concluded that the new ineffective-assistance allegations and evidence related to those allegations could not have been properly considered by the trial court in rending its ruling on the motion and that the new evidence should not be examined in its analysis of the issues on appeal . . . . I

13

> conclude the court of appeals correctly interpreted the law . . . because the new matters were not raised within 30 days of the date sentence was imposed and were not a permissible amendment to the motion for new trial in light of the State's objection.

*Cueva v. State*, 354 S.W.3d 820, 822 (Tex.Crim.App. 2011)(Alcala, J., concurring in denial of motion for rehearing of court's refusal of petition for discretional review, joined by Price and Cochran, JJ.), *citing* TEX.R.APP.P. 21.4(b).

Similarly, in *Zalman*, the defendant presented an argument at the new-trial hearing that was not alleged in his timely-filed motion. 400 S.W.3d at 592. The 30-day period for an amendment expired, but the defendant still filed a "memorandum of law" arguing a new basis for a new trial. *Id.* The State objected to the untimely argument, but the trial court still granted a new trial on that new basis. *Id.* The Court of Criminal Appeals reversed, holding that Rule 21 requires that the grant of a new trial be consistent with the argument contained in the timely-filed motion and related evidence. *Id.* at 594-95 (explaining that, to hold otherwise, "would defeat the notice requirements of the motion."). Accordingly, the trial court was not allowed to consider the arguments contained in the late-filed "memorandum of law" or asserted at the new-trial hearing on the motion. *Id.*

Here, Frias filed his motion for new trial within the 30-day period permitted and did not file an amendment. The hearing on the motion occurred more than 30 days after the trial court imposed sentence. Frias raised the following arguments in his motion: (1) Counsel failed to adequately consult with him about the facts of his case prior to trial; (2) counsel failed to investigate the facts upon which the prosecution was based, including K.N.'s description of the car and the manner in which he allegedly abducted her; and (3) counsel failed to investigate Frias's character and background. Several of the arguments made at the new-trial hearing do not comport with his arguments asserted in his original motion for new trial. The State did not have

14

prior notice of these contentions and objected to the arguments as untimely. And these arguments appear to form the foundation of the trial court's findings. Specifically, the trial court found that: (1) counsel failed to interview the State's witnesses for the current offenses; (2) counsel failed to interview witnesses related to the extraneous offenses; (3) he did not hire a private investigator, DNA expert, or mental health expert; (4) he failed to file any pretrial motions; (5) he did not conduct effective cross-examination; and (6) he failed to call any witnesses at the guilt-innocence phase of trial. Accordingly, these new arguments could not support the grant of a new trial. Therefore, to the extent the trial court granted relief based on these new arguments, it abused its discretion. *Zalman*, 400 S.W.3d at 594-95; *Cueva*, 339 S.W.3d at 858-59; *see also Cueva*, 354 S.W.3d at 822 (Alcala, J., concurring). To conclude otherwise would lead to an anomalous result, preventing parties from raising new arguments in written amendments to new-trial motions while allowing them to assert new arguments at the hearing without notice to the State. *Shamim*, 443 S.W.3d 316, 327. The appellate rules do not permit such a result. *Id.*

## INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant has a Sixth Amendment right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the usual case, an appellant, in order to obtain a reversal of his conviction on the ground of ineffective assistance of counsel, must demonstrate both deficient performance and prejudice. *Cannon v. State*, 252 S.W.3d 342, 349-50 (Tex.Crim.App. 2008). That is, he must demonstrate, by a preponderance of the evidence, that: (1) his trial counsel's performance was deficient and (2) harm resulted from that deficiency sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The proper standard of review for claims of ineffective assistance

of counsel is whether, considering the totality of the representation, counsel's performance was ineffective. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999), *citing Ex Parte Felton*, 815 S.W.2d 733, 735 (Tex.Crim.App. 1991). If the *Strickland* test is not met, an ineffective assistance of counsel claim is defeated. *Strickland*, 466 U.S. at 700, 104 S.Ct. at 2071.

An attorney's performance is deficient when it falls "below an objective standard of reasonableness" under prevailing professional norms and according to the necessity of the case. *Ex Parte Moore*, 395 S.W.3d 152, 156-57 (Tex.Crim.App. 2013). We refer to standards published by the American Bar Association and other similar sources as guides to determine prevailing professional norms. *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2065, *citing ABA Standards for Criminal Justice* (2d ed. 1980). However, such publications are only guides because no set of detailed rules can completely dictate how best to represent a criminal defendant. *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2065.

In evaluating trial counsel's performance, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and was motivated by sound trial strategy. *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). When the record is silent concerning the reasons for trial counsel's actions, we do not engage in speculation to find ineffective assistance of counsel. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex.App.--Houston [1st Dist.] 1996, no pet.). Accordingly, ineffective assistance claims must be firmly found in the record and the record must affirmatively show the alleged ineffectiveness. *Mallet v. State*, 65 S.W.3d 59, 63 (Tex.Crim.App. 2001), *quoting Thompson*, 9 S.W.3d at 814.

However, if an appellant can demonstrate that defense counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," so that there was a constructive

16

denial of the assistance of counsel altogether, then prejudice, because it is "so likely," is legally presumed. *United States v. Cronic*, 466 U.S. 648, 658-660, 104 S.Ct. 2039, 2046-47, 80 L.Ed.2d 657 (1984); *see also Bell v. Cone*, 535 U.S. 685, 696-97, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002)(noting that, under *Cronic*, defense counsel's failure to test the prosecution's case must be "complete" before prejudice is presumed); *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 ("constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice"); *Ex Parte McFarland*, 163 S.W.3d 743, 752-53 (Tex.Crim.App. 2005)(discussing constructive denial of counsel and presumed prejudice). We find that the trial court's reliance on *Cronic* is misplaced.

The differences between the *Strickland* and *Cronic* standards are not of degree, but of kind. *Bell*, 535 U.S. at 697, 122 S.Ct. at 1851. In *Bell*, the Supreme Court explained that *Cronic* based the possibility of a presumption of prejudice on an attorney's failure to test the prosecution's case and specified that "the attorney's failure must be complete." 535 U.S. at 696-97; 122 S.Ct. at 1851. Specifically, the State points to several instances in the record to illustrate that *Cronic* does not apply, including: counsel's voir dire examination, his brief opening statement at the guilt phase, his cross-examination of some of the State's witnesses during the guilt phase, his objections, and closing argument. The record also reflects that counsel gave a very brief opening statement during the punishment phase of trial, called three witnesses, and delivered a closing argument. While his defense can be described as minimal at best, we cannot say that his failure to test the State's case was "complete." *See Cannon*, 252 S.W.3d at 350 (finding that trial counsel's failure to test the prosecution's case was complete where counsel declined to participate in jury selection, declined to enter a plea for his client, declined to make an opening or closing argument to the jury, declined to cross-examine any of the State's

17

witnesses, declined to make any objections, declined to offer any defense, declined to request any special jury instructions, and declined to offer any evidence or argument with respect to punishment).

While Frias's complaints about counsel's conduct concern a litany of alleged errors, omissions, and strategic blunders, the record does not support a finding that the *Cronic* presumption should be applied. The trial court erred in applying it. *See U.S. v. Barton*, 526 F.App'x 360, 362 (5th Cir. 2013), *citing Gochicoa v. Johnson*, 238 F.3d 278, 284-85 (5th Cir. 2000)(concluding *Strickland* rather than *Cronic* applies when defendant's attorney lodged objections, examined witnesses, and argued case to jury at trial); *see also In re V.V.*, 349 S.W.3d 548, 560 (Tex.App.--Houston [1st Dist.] 2010, pet. denied)(rejecting *Cronic* standard where attorney had not entirely failed to subject the Department of Family and Protective Services' case to adversarial testing). We thus conclude that the ineffective assistance of counsel claim should have been governed by *Strickland* and not *Cronic*. Because the trial court also made additional findings under the Strickland test, we must now examine those findings.

The State argues that Frias failed to establish deficient performance of trial counsel and sufficient prejudice under *Strickland*. We believe that Frias overcame his burden in establishing that counsel's performance was deficient. But we conclude that he failed to prove prejudice. Therefore, the trial court also erred in granting a new trial to the extent it relied on *Strickland*.

The record is not silent as to counsel's trial strategy at trial. Frias filed his motion for new trial and called counsel as a witness to explain his actions. *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex.Crim.App. 2003)(noting that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective"); *see also Anderson v. State*, 193 S.W.3d 34, 39-40 (Tex.App.--Houston [1st Dist.] 2006, pet. ref'd)(holding

18

ineffective assistance of counsel claim not founded by record where appellant failed to call attorney during motion for new trial hearing to explain reasons for alleged failure to investigate or present mitigating evidence).

Counsel's performance was deficient because he made an unreasonable decision not to investigate his client's mental-health history. One necessary facet of professional assistance is the investigation of the facts and law applicable to a case. *Ex Parte LaHood*, 401 S.W.3d 45, 50 (Tex.Crim.App. 2013). Counsel has a duty in every case to make a reasonable investigation or a reasonable decision that an investigation is unnecessary. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *see Ex Parte Imoudu*, 284 S.W.3d 866, 870 (Tex.Crim.App. 2009). "When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Ex Parte Martinez*, 195 S.W.3d 713, 721 (Tex.Crim.App. 2006).

Relevant American Bar Association standards state that "[d]efense counsel should consider all procedural steps which in good faith may be taken, including, obtaining psychiatric examination of the accused when a need appears . . . ." *ABA Standards For Criminal Justice: Prosecution and Defense Function* 4-3.6 (3d ed. 1993); *Ex Parte LaHood*, 401 S.W.3d at 50. This standard, while not binding, still appears to comport with the applicable standard at the time of Frias's trial--whether counsel had or should have had a bona fide doubt as to his client's competency to stand trial, insanity at the time of the offenses, or disability relevant to the mitigation of his punishment. *Standard* 4-4.1, titled "Duty to Investigate," states in part, that "[d]efense counsel should conduct a prompt investigation" and explore all avenues leading to relevant facts of the case. *Id.* at 4-4.1; *Ex Parte LaHood*, 401 S.W.3d at 50.

Monteros testified at the new-trial hearing that he was aware Frias had a long history of

19

mental illness because both he and his mother discussed it with him. Specifically, counsel knew Frias suffered from bipolar disorder and manic depression. Frias testified that he had been enrolled in special education classes during his entire schooling experience and was seventeen years old when he was first referred for a psychiatric evaluation to determine whether he had a mental disorder. He was ultimately diagnosed with bipolar disorder, manic depression, and schizophrenia and doctors prescribed him medications including Zoloft, Paxil, Depakote, Lithium, Trazodone, and Seroquel. For several years, he sought treatment for his illnesses. His mother similarly testified that she tried to provide Monteros with more extensive information regarding her son's bipolar disorder and manic depression. She also discussed how the family had a history of mental illness, including depression and schizophrenia. Morales explained that Frias suffered manic episodes, and had difficulty adjusting to his medications and complying with a treatment regimen. She also indicated that while she could not say whether Frias was competent to stand trial, the mental illness he suffered from were of the type that would affect a person's competency.

In short, the record reveals that Monteros knew his client had mental health issues, but nonetheless believed he was competent to stand trial. He was able to come to such a conclusion apparently without conducting any type of psychiatric evaluation, talking to Frias or his family members more extensively, obtaining any prior medical records, or contacting prior counselors and/or doctors who may have treated Frias. After reviewing the quantum of evidence known to counsel before and during trial, and whether the known evidence would lead a reasonable attorney to investigate further, we conclude that counsel's failure to investigate was unreasonable under the circumstances. *See Ex Parte Martinez*, 195 S.W.3d at 721; *see also Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004)(stating that trial counsel must investigate a client's mental-

20

health history if he has a reason to believe his client suffers from mental-health issues); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990)("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems.").

Having decided that counsel's performance was deficient, we now turn to the question of whether Appellee was prejudiced. *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2052.

The Supreme Court's prejudice standard in a *Strickland* analysis is flexible and must be applied in many different contexts. *Ex Parte LaHood*, 401 S.W.3d at 52. For that reason, we review the relevant competency laws and *Strickland* cases to resolve how Frias needed to prove prejudice and ultimately, whether he was prejudiced and thus entitled to relief. *Id.*

At trial, the issue of incompetency must have first been raised by either a party to the case or the trial court. *See* TEX.CODE CRIM.PROC.ANN. art. 46B.004(a), (b)(West 2015)(allowing either party or the trial court to suggest that the defendant may be incompetent to stand trial). But regardless of whether a party or the trial court is the one to make the suggestion, a trial court is not authorized to initiate an informal inquiry to determine a defendant's competency unless the evidence of incompetency is sufficient to raise "a bona fide doubt in the mind of the judge regarding whether the defendant is legally competent." *Montoya v. State*, 291 S.W.3d 420, 425 (Tex.Crim.App. 2009); *see Gonzales v. State*, 313 S.W.3d 840, 841-42 (Tex.Crim.App. 2010). Assuming that the trial court harbors a bona fide doubt, it then initiates its informal inquiry to determine if "there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." TEX.CODE CRIM.PROC.ANN. art. 46B.004(c). The Court of Criminal Appeals has held that the court is "to assay just that evidence tending to show incompetency, putting aside all competing indications of competency, to find whether there is

21

some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency." *Ex Parte LaHood*, 401 S.W.3d at 52-53, *citing Sisco v. State*, 599 S.W.2d 607, 613 (Tex.Crim.App. [Panel Op.] 1980). If the trial court finds "some evidence" in the record that "rationally may lead to a conclusion of incompetency[,]" then a trial within a trial should be held on the issue of the defendant's competency. TEX.CODE CRIM.PROC.ANN. art. 46B.005(b); *Sisco*, 559 S.W.2d at 614. Thus, a competency determination is not decided unless the trial court holds a hearing to determine competency, which is authorized only if the court has a bona fide doubt that the defendant is not competent and, after examining the evidence, finds some evidence that the defendant is incompetent. *See Morris v. State*, 301 S.W.3d 281, 287 (Tex.Crim.App. 2009).

Article 46B.003(a) provides that a person is incompetent to stand trial if the person does not have (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person. TEX.CODE CRIM.PROC.ANN. art. 46B.003(a); *see Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068 ("The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors."). We have stated that the factors experts use in conducting a competency evaluation are also helpful to the fact-finder in determining the broader question of competency. *See Morris*, 301 S.W.3d at 286 n.10; *see also* TEX.CODE CRIM.PROC.ANN. art 46B.024. These factors include whether a defendant can:

> (1) Understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

*Morris*, 301 S.W.3d at 286 n.10. A person is presumed to be competent, and the burden is on a

criminal defendant to prove incompetency by a preponderance of the evidence. TEX.CODE CRIM.PROC.ANN. art 46B.003(b).

The focus of the prejudice inquiry is whether an applicant can show that there was a reasonable probability that he would have been found incompetent to stand trial if the issue of competency had been raised and fully considered. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068. This is true because, under Texas law, even though there are conditions precedent that must be met to obtain a trial on competency, the only way the outcome of the guilt phase of the proceeding would be different is if the defendant proved that he was incompetent to stand trial. *Ex Parte LaHood*, 401 S.W.3d at 54. Anything less than a finding of incompetence would not have changed the outcome. *Id.* In assessing prejudice, we look to the entire record. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.

In its findings of fact, the trial court found that defense counsel performed deficiently in failing to request a psychiatric examination or obtain the services of a mental-health expert to determine whether his client was incompetent to stand trial. After reviewing the record, we are of the opinion that Frias was not prejudiced by his counsel's deficient performance because he has not met his burden of proof that, but for his trial counsel's deficient performance, there is a reasonable probability that a fact-finder would have found him incompetent to stand trial. Frias's actions both before and during the trial illustrate that he made a reasoned choice of legal strategies and options.

For example, Frias expressly rejected the State's plea recommendation of 45 years' confinement and confirmed to the trial court that he understood what his rejection meant. When the trial court asked if he understood how his sentences would run, he correctly discussed the nature of stacked sentences. We also agree with the State that his outburst during trial has been

23

mischaracterized. The outburst revolved around a witness he thought was lying rather than around his mental condition or lack of understanding of the proceedings before him. Outside the presence of the jury, Frias complained about his inability to advance his desired self-defense theory against the witness whom he believed was lying. All of these facts weigh against a finding of incompetence. *Ex Parte LaHood*, 401 S.W.3d at 55 (finding that the record did not support a finding of incompetence based in part on the fact that the defendant engaged in a reasoned choice of legal strategies and options).

During the punishment phase, Frias appeared to be remorseful, tried to minimize his culpability for both the charged and extraneous offenses, and acknowledged that he lied in his statement to the police. This supports a finding of competence. *Ex Parte LaHood*, 401 S.W.3d at 56 (holding that the record reflected the defendant's competence during his testimony because: (1) he was able to disclose pertinent facts and events of the case, (2) understood the adversarial nature of the proceedings, and (3) he put forth a defense with a competing theory of events that, if believed, would have resulted in a not-guilty verdict).

In his new-trial testimony, Frias maintained that while he did not know exactly what was going on during trial, he did not have difficulty understanding the trial court's questions about the State's plea recommendation, and he understood the role of the trial judge, the prosecutor, and his defense attorney. When he called his former probation officer to testify about her interactions with him ten years prior, she was unable to definitively opine as to whether his mental illnesses affected his competency to stand trial for the current offenses. This also weighs against a finding of incompetence. *Cf. Conrad v. State*, 77 S.W.3d 424, 426 (Tex.App.--Fort Worth 2002, pet. ref'd)(holding that appellant failed to prove he was prejudiced by any such deficient performance where he failed to present evidence at new-trial hearing that any physician

24

or social worker would have testified that he was legally insane at the time of the offense, failed to elicit any lay testimony to establish insanity, and failed to otherwise present any evidence establishing legal insanity).

In its findings of fact, the trial court determined that Monteros's performance was deficient when he failed to request a psychiatric examination or obtain the services of a mental-health expert to determine whether Frias was insane at the time of the offense. We agree with the State that he failed to establish prejudice.

Similar to our competency analysis, part of this insanity analysis necessarily includes a consideration of whether an insanity defense would have been validly raised and likely to succeed at trial. *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). Again, Frias failed to present any evidence at his new-trial hearing that would raise the possibility that he might have been legally insane at time he committed the offense. While he did testify, none of his testimony indicated that he did not know his conduct was wrong. *See* TEX.PEN.CODE ANN. § 8.01(a)(West 2015)("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe disease or defect, did not know that his conduct was wrong."). And while he did present testimony from Morales in her capacity as a licensed professional counselor, her testimony failed to illustrate that Frias was in fact, insane at the time of the offense. Morales was the only professional who testified about his mental condition; Frias did not call any other health-care experts, like a doctor or social worker, to testify otherwise. *See Conrad*, 77 S.W.3d at 426 (holding that even though counsel rendered deficient performance in his investigation of appellant's mental history, appellant failed to prove prejudice where he failed to present evidence at the new-trial hearing that any physician or social worker would have testified that he was legally insane at the time of the offense, failed to elicit

25

any lay testimony to establish insanity, and failed to otherwise present any evidence establishing legal insanity); *cf. Nutter v. State*, 93 S.W.3d 130, 132 (Tex.App.--Houston [14th Dist.] 2001, no pet.)(holding that the existence of a mental disease, alone, does not establish legal insanity; rather, the accused must have been mentally ill at the time of the offense to the point that he did not know his conduct was wrong).

Finally, the trial court also determined that counsel's performance was deficient when he failed to request a psychiatric examination or obtain the services of a mental-health expert to determine whether Appellee suffered from any mental defects or disabilities that might mitigate his punishment. In evaluating prejudice within this context, we weigh "the evidence in aggravation against the totality of available mitigating evidence" in the entire record. *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003). In conducting this assessment, courts will often review the evidence presented during the new trial hearing to see if a proper investigation would have uncovered evidence that could have changed the outcome of the trial. *See Freeman v. State*, 167 S.W.3d 114, 120 (Tex.App.--Waco 2005, no pet.); *Conrad*, 77 S.W.3d at 426-27.

Frias committed a violent sexual offense and already had an extensive and violent criminal history. He presented some lay testimony regarding his mental illness. Morales testified that while he suffered from mental illness that may be associated with a finding of incompetency, she could not say for certain whether he was actually incompetent for his trial. When asked how a mental illness could possibly affect him, she testified that if he were anxious, then he may have had manic episodes and "rapid cycling, so [he] may not think." On cross-examination, Morales also testified that bipolar disorder did not cause those diagnosed with it to commit rape and other similar crimes. Moreover, she admitted that during her interactions with

Frias, he never indicated that he did not understand who the judge, prosecutor, defense attorneys, and probation officers were and the roles they played in his case.

Frias did not submit any evidence that explains how potential mitigating evidence of his mental history would have changed the outcome of his trial. Without more, we cannot say that he has met his burden in establishing prejudice as required by the second prong of *Strickland*. *See Vaughn v. State*, No. 14-08-00522-CR, 2009 WL 3294998, at \*4 (Tex.App.--Houston [1st Dist.] Oct. 15, 2009, pet. dism'd)(mem. op.)(not designated for publication)(holding that appellant failed to show prejudice where he failed to submit any evidence at the new-trial hearing that explained how potential mitigating evidence of his mental history would have changed the outcome of his trial); *see also Conrad*, 77 S.W.3d at 427-27 (counsel's failure to investigate defendant's mental health history did not prejudice defendant because defendant offered no evidence at hearing on motion for new trial that he was legally insane). The trial court erred to the extent it determined that Frias was prejudiced by counsel's deficient performance.

The trial court erred in granting the motion for new trial because it improperly: (1) relied on untimely amendments; (2) determined Frias was denied counsel under *Cronic*; (3) and concluded that he was also denied effective assistance of counsel under *Strickland*. We sustain the State's point sole, reverse the trial court's grant of a new trial, and reinstate the conviction.

May 27, 2016

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.